

NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

*Honli DeWayne Hale*

Signed April 30, 2010                                              **United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| COOL PARTNERS, INC., a/k/a | § | Case No.  02-30446-HDH-7 |
| COOLLINK BROADCAST NETWORK; | § | |
| COOLLINK; CLBN; and | § | |
| COOL PARTNERS, LLC, | § | |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| ROBERT YAQUINTO, JR., | § | |
| | § | |
| Plaintiff/Counter Defendant, | § | |
| | § | |
| vs. | § | Adversary No. 07-3361 |
| | § | |
| ADMIRAL INSURANCE COMPANY, | § | |
| INC; MONITOR LIABILITY | § | |
| MANAGERS, INC.; ROYAL INDEMNITY | § | |
| CO., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Findings of Fact and Conclusions of Law                                              Page 1

A trial on this adversary proceeding was held from November 3-5, 2009, and concluded on January 14, 2010. The parties also submitted post-trial briefs. The Court adopts the stipulated facts in the parties' joint Proposed Pretrial Order, filed in this proceeding on November 23, 2009, most of which are repeated here for background. In addition, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052:

## Findings of Fact

1. Robert Yaquinto (the "Trustee") is the duly authorized Trustee of the Chapter 7 Bankruptcy estate of Cool Partners, Inc.

2. Defendant Admiral Insurance Company ("Admiral") is a corporation organized under the laws of Delaware.

3. Defendant Monitor Liability Managers, Inc. ("Monitor") is a corporation organized under the laws of Delaware.

4. Admiral and Monitor are sister companies, both owned by a common parent, W.R. Berkley.

5. Defendant Arrowood Indemnity Company, formerly known as Royal Indemnity Company ("Royal") is a corporation organized under the laws of Delaware.

6. Cool Partners, Inc. d/b/a Coollink Broadcast Network (the "Debtor") was a privately held Texas corporation originally established in 1998.

7. The Debtor's business involved owning, developing, and marketing internet applications and also serving as an internet service provider. The Debtor raised approximately $20 million in capital through securities sales to investors

8. On January 22, 2002, the Debtor filed a voluntary bankruptcy petition commencing this Chapter 7 case (the "Bankruptcy Case"). The Trustee was appointed and qualified shortly

thereafter, and has served as Trustee through all relevant periods of this case.

9.    Prior to the Bankruptcy Case, the Debtor had obtained director and officer liability insurance policies ("D&O Insurance") from two insurers – Admiral and Royal.

10.   The Admiral Policy was later extended through January 24, 2002.

11.   Initially, the Admiral Policy had an aggregate annual liability limit of $2,000,000.

12.   At the request of Cool Partners, the aggregate annual liability limit was increased to $5,000,000 in March 2000.

13.   The Admiral Policy provides primary claims-made D&O insurance subject to a $5 million aggregate limit. Payment of defense costs erode the Admiral policy limits..

14.   Royal issued an Excess Directors and Officers Liability and Company Reimbursement Policy to Cool Partners for the policy period of May 9, 2000 to January 10, 2001 (the "Royal Policy").

15.   The Royal Policy was later extended by endorsements through January 24, 2002.

16.   The Royal Policy provides excess claims-made D&O coverage in excess of, the $5 million Admiral Policy.  The Limit of Liability of the Royal Policy was a $5 million aggregate limit of liability each policy year, in excess of the $5 million Primary and Underlying Excess Limit of Liability as set forth in the Schedule of Underlying Insurance which listed the Admiral Policy 6251421.

17.   The exhaustion of the Admiral Policy Limits was a condition precedent to coverage under Royal's Policy.

18.   Prior to the filing of the Bankruptcy Case, the Debtor and certain of its directors and officers were named as defendants in various lawsuits by investors.  The investors believed that they

had been defrauded and that their purchases should be rescinded. Admiral defended the investor suits under a reservation of rights, and provided defense counsel. In all, Admiral hired 6 sets of defense counsel to defend suits against the officers and directors.

19. One of the underlying lawsuits brought against the debtor and certain of its directors and officers was the "Rosenthal Action" (Rosenthal, et al. v. Cool Partners, Inc., et al., Cause No. 02-00984-E, County Court at Law No. 4, Dallas County, Texas), which involved, inter alia, a securities fraud suit filed in Texas state court against the Debtor and a number of its directors and officers.

20. The claimants in the Rosenthal Action alleged, inter alia, various causes of action arising out of the Rosenthal defendants' alleged fraud, misrepresentation and negligence in connection with the Rosenthal defendants' efforts to have the Rosenthal claimants invest in the Debtor and subsequently maintain those investments.

21. The Pegasus Action (Yaquinto, Trustee v. Richard Millman, et al., Cause NO. 02-30446-HDH, Chapter 7 Adversary No. 04-03049-HDH, Bankr. N.D. Tex.) was not related to any transactions between the Rosenthal claimants and Cool Partners.

22. On February 14, 2002, Admiral filed an Original Complaint and Request for Declaratory Judgment (the "Admiral Declaratory Judgment Action") in an action styled Admiral Insurance Company, Inc. v. Leo Hindrey, Selwyn Josset, and Richard Millman, Civil Action No. 3:02cv-0310, in the U.S. District Court for the Northern District of Texas, Dallas Division. On April 1, 2002, Admiral filed an Amended Complaint and Request for Declaratory Judgment in the Admiral Declaratory Judgment Action seeking, inter alia, to rescind or reform its Policy with Cool Partners.

**Findings of Fact and Conclusions of Law**                                                      **Page 4**

23. In its Amended Complaint, Admiral asserted that the Cool Partners officers and directors had not made adequate disclosures about past securities violations and about what they knew about the impending investor suits, so Admiral/Monitor asserted that they had a right to rescind its policy. Royal also had a similar rescission position and both carriers reserved all rights relating to policy rescission.

24. On January 21, 2004, the Trustee filed a Complaint for Declaratory Judgment against Admiral as an adversary proceeding in this Bankruptcy Case, alleging that Admiral had refused to defend or indemnify Cool Partners with respect to the CB Parkway Action and two other cases, the "Barnidge Action" and the "Fiorentino Action" (the "Trustee v. Admiral Declaratory Judgment Action"). In addition to claiming that Admiral breached its duty to, among other things, defend and indemnify under the Admiral Policy, the Trustee sought exemplary damages for Admiral's alleged breach of the duty to good faith and fair dealing, as well as attorneys' fees.

25. The Admiral Declaratory Judgment Action and the Trustee v. Admiral Declaratory Judgment Action were consolidated as an adversary proceeding in the Bankruptcy Case ("Consolidated Admiral Coverage Litigation").

26. On January 20, 2004, the Trustee filed a Complaint for Declaratory Judgment against Royal ("Trustee v. Royal Declaratory Judgment Action") as an adversary proceeding in the Bankruptcy Case.

27. The Trustee's Complaint alleged, inter alia, that counsel for Royal sent the Trustee a letter purporting to rescind coverage under the Royal Policy and declaring the Royal Policy "null and void."

**Findings of Fact and Conclusions of Law**                                    **Page 5**

28.  The Trustee's Complaint sought a declaratory judgment that the Royal Policy was in effect and obligated Royal to defend and indemnify the Trustee for covered claims. The Trustee's Complaint further sought a declaratory judgment that Royal had waived or is estopped from attempting to rescind the Royal Policy.  The Trustee's Complaint also sought attorneys' fees.

29.  The Trustee, Admiral, and Royal – among others – attended a mediation in April, 2004.  At the April, 2004 mediation,  there were discussions between Admiral and Royal of a scenario in which Admiral/Monitor would tender its policy limits (to prove that Admiral had "exhausted" its $5M limit) but would take an assignment of rights or exercise some subrogation rights to recoup all or part of the policy limits.  Royal rejected any such settlement, and advised that such a scenario would not result in exhaustion of the policy limits and that such "deal" would not trigger Royal's policy.  The cases did not settle at the April, 2004 mediation.

30.  In July 2005, Geoff Harper, counsel for the Trustee, informed Admiral that his formal demand to settle was $6.2 million, but that he thought he could get his clients to settle for $3.75 million. This demand was never communicated to Royal.  At this point, the Admiral policy still had at least $3 million left on its limits.  Further, in August 2005, Mr. Harper discussed with Admiral a global settlement which involved a complete release to the officers and directors in exchange for policy limits.  Admiral rejected the offer and never reported it to Royal.

31.  Mr. Harper sent letters to both Admiral and Royal requesting their remaining policy limits in full settlement of the Plaintiff's claims.  Later, they attended a second mediation in Dallas, Texas on September 30, 2005 with mediator Hesha Abrams.  Additionally, as of September

**Findings of Fact and Conclusions of Law**                                          **Page 6**

30, 2005, some of the attorneys representing the directors and officers in various underlying lawsuits had outstanding invoices that had not been paid. (the "Incurred Fees").

32. At the mediation, the mediator advised Royal that Admiral had settled with the Trustee and with the Rosenthal Plaintiffs for a total payment of $3,591,078.17, representing the difference between the $1,408,921.83 in defense and indemnity costs paid by Admiral prior to September 30 and the Admiral policy limits of $5 million. The mediator advised Royal that the outstanding and unpaid legal fees incurred by defense counsel prior to September 30, totaling approximately $1 million in unpaid invoices and $600,000 in work in progress, were the responsibility of Royal. Geoff Harper, with a more complete understanding of the parties' positions, made similar, and inaccurate, representations to Royal. Mr. Martinson's testimony regarding statements made to him by Mr. Harper was very credible. Following the mediation, Royal was found with a Hobson's choice. The litigation against its insureds was quite dangerous, costly and immediate; therefore, Royal entered into a "high/low" settlement agreement with the Trustee on October 10, 2005.

33. The Admiral Settlement Agreement and Policy Release (the "Admiral Settlement Agreement") with the Trustee was entered into as of November 30, 2005, and a copy of the Admiral Settlement Agreement was attached to the Motion to Approve the Admiral Settlement. A copy of the Pegasus Settlement Agreement was attached to the Motion to Approve the Pegasus Settlement.

34. The Royal Settlement Agreement with the Trustee was entered into in early December 2005, and a copy of the Royal Settlement Agreement was attached to the Motion to Approve the Royal Settlement.

35.     On December 8, 2005, the Motions to approve the Royal, Admiral, and Pegasus Settlement Agreements, with attached agreements, were publicly filed in the Bankruptcy Case, in that order.

36.     Attorneys for Royal were served with and reviewed a copy of the Admiral Settlement Agreement with the Trustee within a few days after a copy of the Admiral Settlement Agreement was filed in the Bankruptcy Case on December 8, 2005. Royal had requested a copy of the written settlement agreement reached in the September 30, 2005 mediation from Mr. Harper on October 3, 2005, prior to agreeing to its own settlement. However, Mr. Harper stated to Royal that a written agreement did not exist. This representation was not accurate, because a written agreement between the Trustee and Admiral that was signed on September 30, 2005, was produced in connection with the trial of this proceeding and Mr. Harper had signed it. Further, Mr. Harper led Royal to believe that it was responsible for approximately $1.6 million in pending defense costs, when the Trustee had agreed to pay those as part of the mediated settlement on September 30th. Mr. Martinson's testimony on this point was quite credible.

37.     On December 20, 2005, a hearing was held on the Motions to Approve the Settlement Agreements with Admiral, Pegasus, and Royal before the Bankruptcy Court in the Bankruptcy Case.

38.     At the December 20, 2005 hearing, counsel for Royal stated to the Bankruptcy Court in the Bankruptcy Case the following:

Now, the Court has heard the issue in regard to the fact that a subsidiary of Admiral is going to receive what is represented by Mr. Levy to be approximately $1 million back out of this deal. And I will represent to the Court that until papers were filed in

respect to this issue, my client was not aware of that. Now, I'm not standing here saying Royal isn't going to honor the agreement that it's made. But I am making it very clear on the record that we reserve all of our rights in respect to this matter, as they may relate to Admiral. Admiral was a lower-tier insurer in connection with this deal. We were above them and would not be obligated to drop down until their policy proceeds were exhausted.

Now, under the terms of the deal as it's been represented to the Court, that's happening. But that being said, we reserve all of our rights and we dispute and do not agree in regard to any findings that are made in respect to Admiral having exhausted its policy proceeds in connection with this matter. We're not a party to that. If those findings are made, I want it very clear on the record that we're not subject to those findings.

39.    On December 22, 2005, the Bankruptcy Court entered in the Bankruptcy Case an Order

Granting Motion to Approve Settlement Agreement with Admiral Insurance Company.

Royal did not appeal that Order.

40.    On December 23, 2005, the Bankruptcy Court entered in the Bankruptcy Case an Order

Granting Motion to Approve Settlement Agreement with Royal Indemnity Company.

41.    Admiral paid the Trustee $ 3,591,078.17 on December 27, 2005.

42.    No later than December 27, 2005, the Trustee, Admiral and certain insured directors and

officers had executed the "Admiral Settlement Agreement and Policy Release." Pursuant to

the Admiral Settlement Agreement and the Bankruptcy Court's Order Granting Motion to

Approve Settlement Agreement with Admiral Insurance Company, the Trustee, certain

insured directors and officers, and Admiral filed an Agreed Motion and Stipulation of

Dismissal with Prejudice in the Admiral Declaratory Judgment Action and the Trustee v.

Admiral Declaratory Judgment Action in December 2005.

43.    Royal paid to the Trustee the consideration required under the Royal Settlement Agreement

on December 29, 2005.

44.    On July 25, 2006, the Trustee filed in the Bankruptcy Case a Motion for Interim Distribution to Creditors, seeking authorization of an interim distribution to unsecured creditors holding allowed claims, including Monitor, of approximately 50 percent of the anticipated dividend to each such creditor's claim (the "Interim Distribution Motion").

45.    The Bankruptcy Court entered its Order dated August 29, 2006, in the Bankruptcy Case, granting the Interim Distribution Motion, and the Trustee distributed to Monitor, as the holder of allowed unsecured claims, the sum of $516,798.58 as an interim distribution.

46.    Royal filed an action against Admiral and Monitor in the Superior Court of New Jersey in Camden, New Jersey on March 20, 2007, Docket No. L-1544 (the "New Jersey Action").

47.    Admiral and Monitor made demand on the Trustee for indemnification against the claims and expenses, including attorney's fees, resulting from the New Jersey Action on April 27, 2007, and subsequently.

48.    The Trustee received such demand in April 2007, but has not indemnified Admiral or Monitor against any claims or expenses, including reasonable attorney's fees, resulting from the New Jersey action or the cross-claims of Royal against Admiral and Monitor in this Action.  The Trustee and Admiral have now settled the indemnity claims.

49.    The Trustee filed the present adversary proceeding on November 20, 2007.  The Court in the New Jersey Action on February 1, 2008, dismissed the New Jersey Action without prejudice by reason of *forum non conveniens*.

### Conclusions of law

1.     The Court has jurisdiction over this adversary proceeding pursuant to the provisions

of 28 U.S.C. §§ 1334 and 157. This adversary proceeding is a core proceeding pursuant to 28

U.S.C. § 157(b)(2)(A), (B), (C) and (O).

2.     Under Texas law, an excess insurer has no obligation to make indemnity payments until the

primary policy has been exhausted. *See Dresser Industries, Inc. v. Underwriters At Lloyd's,*

*London* 106 S.W.3d 767, 770 (Tex.App.–Texarkana 2003, pet. denied).

**Royal's Fraud Claims**

3.     Royal alleges that Admiral and/or its agents or representatives, including Monitor, falsely

represented to Royal that Admiral had "exhausted" its policy limits and that such exhaustion

did not in fact occur.  Royal further alleges that such misrepresentations were material and

that Royal reasonably and detrimentally relied upon the representations that Admiral had

exhausted its policy limits by entering into the Royal Settlement Agreement with the Trustee

in 2005, and has been damaged as a result.

4.     Based on this, Royal asserts claims against Admiral for common law fraud.  The elements

of common law fraud under Texas law are "(1) a material misrepresentation; (2) that is false;

(3) made with knowledge of its falsity or recklessness as to its truth; (4) made with the

intention that it should be acted upon by another party; (5) relied upon by the other party,

and (6) causing injury." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,

565 F.3d 200, 212 -213 (5th Cir. 2009) (citing *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*,

51 S.W.3d 573, 577 (Tex. 2001)).

5.      The Court finds that Royal has not shown all of the elements of common law fraud. The Court is concerned about Mr. Harper's representations to Royal and his lack of candor and efforts to reach some type of deal with Admiral to allow it to recoup part of its policy limits; however, the only affirmative representations were not made by Admiral or its counsel. At best, the evidence has shown that the mediator may not have understood that money was flowing back to an Admiral affiliate in the form of a claim in the bankruptcy case when she informed Royal of the terms of the mediated settlement.

6.      Royal also asserts claims for fraud by omission. Pursuant to Texas law, fraud may occur when (i) a party conceals or fails to disclose a material fact within the knowledge of that party, (ii) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, (iii) the party intends to induce the other party to take some action by concealing or failing to disclose the fact, and (iv) the other party suffers injury as a result of acting without knowledge of the undisclosed fact. *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001).

7.      As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information. *Id*. (citing *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). Royal cites to the expert testimony of its expert, John Murphy for the proposition that the had the duty under Texas law to keep Royal informed of Admiral's negotiations with the Trustee. Admiral produced their own expert testimony from Allan Windt that contradicted this testimony. The parties produced no cases directly on point. It seems that this may be the custom and practice in the industry; however, the Court finds no legal duty to disclose that would lead to a fraud by omission claim. This Court, is reluctant,

as an Article I federal court, to find a legal duty exists without clear authority in Texas case law or in the Texas Insurance Code.

**Royal's Claims Under The Texas Insurance Code**

8.    Royal has asserted direct claims against Admiral under Texas Insurance Code sections 541.060 (unfair settlement practices), 541.061 (misrepresentations regarding an insurance policy) and 541.151 (unfair competition and deceptive trade practices). However, the direct claims asserted against Admiral under the Texas Insurance Code are not available to Royal. *See Texas Medical Ass'n v. Aetna Life Ins. Co.,* 80 F.3d 153, 159 -160 (5th Cir. 1996) (the right to sue has been limited by Texas courts to persons in privity of contract with the insurer on an insurance policy or an intended beneficiary of an insurance policy).

9.    Texas courts have expanded this right to sue based on misrepresentations regarding an insurance policy to those with a direct relationship to the insurance company, such as health care providers. *See Brown & Brown of Texas, Inc. v. Omni Metals, Inc.,* __ S.W.3d __ , 2010 WL 1240580, *13 -14 (Tex.App.–Houston March 25, 2010) ("Hospitals and other health care providers must, and do, rely upon the insurance carriers representations of coverage in making their decision regarding admission of potential patients. . . . To insulate the insurance carriers from liability leaves the medical care provider without recourse against the party causing its damage, if it acts in reliance on the representation of coverage."). However, the Court is reluctant to stretch this expansion beyond health care providers without some guidance from the Texas courts. Also, as stated above, the Court has found no misrepresentations directly from Admiral to Royal.

Royal did try to contact Admiral to confirm its exhaustion of policy limits prior to entering into its own settlement, but the testimony at trial revealed that only one phone call was made and it was never returned.

**Royal's Equitable Subrogation Claims**

10.    Even though Texas courts generally do not recognize direct duties owed by a primary to an excess carrier, they do allow actions based on the doctrines of either contractual or equitable subrogation.  *See Royal Ins. Co. v. Caliber One Indemnity Co.*, 465 F.3d 614 (5th Cir. 2006); *see also American Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480 (Tex. 1992).

11.    In the *Canal* case, the Texas Supreme Court considered the duties owed by a primary to an excess carrier, and stated:

> Texas law vests a clear right in the insured to sue the primary carrier for a wrongful refusal to settle a claim within the limits of the policy. *G.A. Stowers Furniture Co. v. American Indemnity Co.*, 15 S.W.2d 544.  The insurer's duty to act as an ordinarily prudent person in business management extends to claim investigation, trial defense and settlement negotiations.  *Ranger County Mut. Ins. Co. v. Guin*, 723 S.W.2d 656, 659 (Tex. 1987). We have not previously considered whether a similar duty is imposed upon the primary insurer in protecting the excess carrier from damages for wrongful handling of a claim. . . .we hold that an excess carrier may bring an equitable subrogation action against the primary carrier.  This does not, however, impose new or additional burdens on the primary carrier, since our prior decisions in *Stowers* and *Ranger County* imposed clear duties on the primary carrier to protect the interests of the insured.  The primary carrier should not be relieved of these obligations simply because the insured has separately contracted for excess coverage.

> ****

> Only a few jurisdictions have permitted a direct action,  rather than limiting the excess carrier to an equitable subrogation claim.  Excess insurers prefer a direct action because, under the theory of equitable subrogation, they are

subject to any defenses assertable against an insured, including the refusal to settle and the failure to cooperate. Because none of these circumstances is present in the case before us, however, and the excess insurers appear to have an adequate remedy using equitable subrogation, we decline at this time to permit a direct action.

*Id*. at 482-483 (citations omitted).

12.     In the present case, Royal asserts claims against Admiral to recover what it asserts to be an overpayment to the Trustee, based on the doctrine of equitable subrogation. Equitable subrogation arises when one person, acting involuntarily, has paid a debt for which another was primarily liable, and which, in equity, should have been paid by the primarily liable person. *See Mid-Continent Insurance Co. v. Liberty Mutual Insurance Co.*, 236 S.W.3d 765, 774 (Tex. 2007).

13.     Equitable subrogation "is a legal fiction [whereby] an obligation, extinguished by a payment made by a third person, is treated as still subsisting for the benefit of this third person, so that by means of it one creditor is substituted to the rights, remedies, and securities of another." *First Nat'l Bank of Houston v. Ackerman*, 70 Tex. 315, 319-20, 8 S.W. 45, 47 (1888). The general purpose of equitable subrogation is to prevent unjust enrichment. *First Nat'l Bank v. O'Dell*, 856 S.W.2d 410, 415 (Tex.1993).

14.     The Fifth Circuit panel in *Royal Ins. Co. v. Caliber One Indemnity Co.*, 465 F.3d 614 (5th Cir. 2006), employed the doctrine of equitable subrogation under a similar set of facts to the present action before the Court. In that case, Methodist Retirement Communities was insured by three companies under primary and excess liability policies. Hartford Underwriters Insurance Co. provided primary coverage of up to $1 million for each "medical incident" under a professional liability policy or "occurrence" under a general liability policy.

Caliber One Indemnity Co. provided the same type of primary coverage and Royal Insurance Co. provided excess coverage. While reserving their respective rights to deny coverage, Hartford and Caliber One agreed to share the cost of defending Methodist. The Plaintiff offered to settle for $3 million and Methodist demanded that Hartford, Caliber One and Royal accept the offer. The suit ultimately settled for $2 million, of which Caliber One contributed $800,000, Hartford contributed $200,000 and Royal contributed $1 million. Royal then sued Hartford and Caliber One in Texas state court to recoup the $1 million it had paid. That suit was removed to the U.S. District Court for the Southern District of Texas on the basis of diversity jurisdiction. The parties consented to conduct all proceedings before a United States magistrate judge. They filed cross-motions for summary judgment, and the magistrate judge granted judgment in favor of the primary carriers. The judge concluded that under Texas law, an excess carrier has an equitable subrogation claim against a primary insurer "only when it is predicated on the violation of a tort duty owed to the insured" and that the only tort theory under which such an insured may proceed is negligence, and concluded that neither of the primary carriers had been negligent. *See Royal Ins. Co. v. Caliber One Indemnity Co.*, 465 F.3d at 616-617 (discussing the case background and the magistrate judge's ruling). The judge reasoned that because Methodist had indicated that it had only $1,000,000 in primary coverage when it demanded that its insurers settle, this was an admission by the insured that was binding on Royal, as subrogee.

15. The Fifth Circuit decision stated, "It is well-recognized by the Supreme Court of Texas that when more than one policy covers an occurrence, 'all insurers whose policies are triggered must allocate funding of the indemnity limit among themselves according to their

subrogation rights.' A Texas court of appeals had no difficulty concluding that when an excess carrier sued to recover a primary carrier's policy limits after the excess carrier had paid an agreed judgment, the excess carrier had stated a cause of action for subrogation. *Royal Ins. Co. v. Caliber One Indemnity Co.*, 465 F.3d at 618 (quoting *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 855 (Tex.1994); and citing *Argonaut Ins. Co. v. Allstate Ins. Co.*, 869 S.W.2d 537, 543 (Tex.App.--Corpus Christi 1993, writ denied)).

16.     "An insurer has a duty to indemnify an insured for losses covered by the insurance policy." *Royal Ins. Co. v. Caliber One Indemnity Co.*, 465 F.3d at 619. When faced with the lower court's determination that Royal could not pursue a claim against the primary carriers because Methodist indicated in a letter that its primary insurance coverage under the Hartford and Caliber One policies was limited to $1,000,000, and Methodist never demanded that Hartford or Caliber One pay more than they did, the Fifth Circuit panel stated:

> The Supreme Court of Texas recognized equitable subrogation as a remedy for excess carriers precisely because an insured who has excess insurance coverage may not have any incentive to press its primary carrier for the full limits of its policy. In *Canal*, the Texas court said:

> *Stowers* and *Ranger County* imposed clear duties on the primary carrier to protect the interests of the insured. The primary carrier should not be relieved of these obligations simply because the insured has separately contracted for excess coverage. In this situation, where the insured has little incentive to enforce the primary carrier's duties, the excess carrier should be permitted to do so through equitable subrogation.

> An insured cannot reduce its primary policy limits to the detriment of its excess carrier any more than it can expand those limits. To allow Methodist to estop its excess carrier would give Methodist the unilateral right to determine when primary policy limits were exhausted within the meaning of its excess policy. The limits of the primary policies are questions to be determined by the policies themselves, not the insured, just as the question

of whether those limits have been exhausted is determined by the policies.

*Id*. at 620-621 (internal citations omitted).

17.     Similarly, Admiral argues that the Texas Supreme Court has limited an excess carrier's

subrogation rights such as Royal is claiming in the present case, where no direct tort duty is

owed to the insured or the insured has settled all of his claims.  However, just as this

argument has been refuted by the Fifth Circuit as stated in the *Royal Ins. Co. v. Caliber One

Indemnity Co*. decision, the Texas Supreme Court has also stated in *Mid-Continent

Insurance Co. v. Liberty Mutual Insurance Co.*, that "In Canal, we recognized equitable

subrogation as a basis for an excess insurer's recovery against a primary insurer to prevent

a primary insurer from taking advantage of an excess insurer, acting solely as such, when a

potential judgment approaches the primary insurer's policy limits.  The excess insurer would

be forced to pay for a debt for which another insurer was primarily liable. . . . Equity

demanded a remedy for the excess insurer." 236 S.W.3d 765, 776 (Tex. 2007).  In the present

proceeding before the Court, equity also demands a remedy for Royal.  Admiral, the primary

carrier, paid the dollar amount of its remaining policy limits to the Trustee, but received what

amounted to a claim for a potential one million dollar payment from the bankruptcy estate

in return.  Royal did not receive the details of this arrangement until it had already agreed to

pay the Trustee under its separate settlement agreement, and after it was at an intersection

with its insureds, and facing an expensive trial almost immediately.  In a real sense, Royal

was "flim-flammed."  The primary carrier paid policy limits and received back an interest, so

to speak.  The Court does not believe that Texas state courts would allow such actions by a

primary against an excess carrier and believes that they would provide a remedy to the excess

insurer.

**Unjust Enrichment**

18.     "A party may recover under the unjust enrichment theory when one person has obtained a

benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels*

*Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex.1992). "Unjust enrichment,

itself, is not an independent cause of action but rather 'characterizes the result of a failure to

make restitution of benefits either wrongfully or passively received under circumstances that

give rise to an implied or quasi-contractual obligation to repay.'" *Argyle Independent*

*School Dist. ex rel. Bd. of Trustees v. Wolf*, 234 S.W.3d 229, 246-247 (Tex.App.–Fort Worth

2007, no pet.) (quoting *Friberg-Cooper Water Supply Corp. v. Elledge*, 197 S.W.3d 826, 832

(Tex.App.–Fort Worth 2006). Unjust enrichment also arises when a person fails to "make

restitution of benefits either wrongfully or passively received under circumstances that give

rise to an implied or quasi-contractual obligation to repay." *Walker v. Cotter Props., Inc*.,

181 S.W.3d 895, 900 (Tex.App.–Dallas 2006, no pet.). To recover under an unjust

enrichment theory, the benefits to the other party must be actually unjust under the principles

of equity. *Mowbray v. Avery*, 76 S.W.3d 663, 679 (Tex.App.–Corpus Christi 2002, pet.

denied).

19.     Generally, when a valid, express contract covers the subject matter of the parties' dispute,

there can be no recovery under a quasi-contract theory, such as unjust enrichment. *See*

*Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000). "This is because parties

should be bound by their express agreements, and when a valid agreement already addresses

the matter, recovery under an equitable theory is generally inconsistent with the express

terms of the agreement. An exception to this rule is when overpayment was made under a

valid contract." *City of The Colony v. North Texas Mun. Water Dist*., 272 S.W.3d 699, 731 (Tex.App.–Fort Worth 2008, pet. dismissed) (citations omitted).

20. Since the Court has found Admiral liable to Royal under a theory of equitable subrogation, a claim for unjust enrichment would only be available to Royal as an alternative theory of recovery for what amounts to an overpayment by Royal that should have been borne by Admiral, or a payment made to Admiral on account of the claim it received via its settlement agreement with the Trustee, that should have gone to Royal. *See Vesta Ins. Co. v. Amoco Prod. Co.*, 986 F.2d 981, 988 (5th Cir. 1993). As described above, Admiral received a benefit, a claim in the bankruptcy case, causing Royal to make an overpayment. Therefore, alternatively, the Court finds that Royal is entitled to recover the overpayment under the theory of unjust enrichment.

**Declaratory Judgment**

21. Royal seeks a declaratory judgment that Admiral has not in fact exhausted its policy limits due to the transfer to Admiral, through Monitor, of the Pegasus claims and that Royal is entitled to any distributions by the Trustee to Admiral as holder of the allowed unsecured Pegasus claims in the underlying bankruptcy case. *See* 28 U.S.C. § 2201(a). Admiral asserts that either this issue was waived by Royal by not objecting to its settlement agreement with the Trustee or backing out of its own settlement agreement, or it is precluded by the findings made in the order approving its settlement agreement with the Trustee and any recovery, including subrogation, is further bared releases made by the insureds as part of the settlement agreement.

22. At the hearings to approve both settlement motions, Royal expressly reserved its rights

against Admiral due to its failure to properly pay its policy limits.  Further, had Royal backed out of its agreement with the Trustee, it would have put its insureds at risk and opened itself up to its own liability to them.  Thus, there was no waiver.

23. As to the binding effect of Admiral's settlement with the Trustee, Royal was a third party to the settlement and should not be bound by the findings in the order after expressly reserving its rights on the record.  *See Lindsey v. Prive Corp.*, 161 F.3d 886, 892 (5th Cir. 1998). Further, it was not a creditor with a position to object to the settlement.

**Damages**

24. The Court finds that Royal is entitled to recover the value of the payment made to Admiral on account of the Pegasus Claims (given to Monitor via an assignment directed by Admiral), plus interest from the date of payment.  *See National Union Fire Ins. Co. of Pittsburgh, Pa. v. Insurance Co. of North America*, 955 S.W.2d 120 (Tex. App–Houston 14th Dist. 1997), *aff'd*, 20 S.W.3d 692 (Tex. 2000); *see also Phipps v. Fuqua*, 32 S.W.2d 660, 663 (Tex.Civ.App–Amarillo 1930, writ ref'd).

25. Royal's expert, Mr. Christopher Welde, gave his opinion that had the settlement with the Trustee not been structured to pay the outstanding fees and costs of defense counsel of approximately $1.6 million, Royal would have paid $2,833,598 less in settlement.  However, the Court finds that the outstanding defense costs would have been paid by either Admiral, as primary, or Royal, as excess insurer.  Also, the Court cannot determine whether the Trustee and the Rosenthal plaintiffs would have accepted less in settlement from Royal by virtue of paying these fees outside of the estate.  It is unfortunate that the Trustee and his counsel chose to funnel the defense costs through the bankruptcy estate as part of the

settlement, rather than have them paid directly, resulting in higher fees paid to the professionals in the bankruptcy case, but Royal did not prove that it would have been required to pay less, or that a settlement was possible at a lower amount if things had been done differently.

26. Both Royal and Admiral agree that the winning party in this case is entitled to attorney's fees pursuant to either 28 U.S.C. § 2202, or section 38.001 *et seq*. of the Texas Civil Practice & Remedies Code. Attorney's fees may be awarded under 28 U.S.C. § 2202 in "cases of bad faith, vexation, wantonness, or oppression relating to the filing or maintenance of the action." *Mercantile Nat'l Bank v. Bradford Trust Co.*, 850 F.2d 215, 218 (5th Cir. 1988). Attorneys fees are also available under § 2202 where they are available under non-declaratory judgment circumstances. *Id*. Here, attorneys fees are available under section 38.001 *et seq*., since Royal's subrogation claims and Admiral's counter claims, along with their declaratory judgment claims require the court to interpret each of the parties respective rights under their insurance contracts.

**Conclusion**

27. Royal is entitled to a judgment against Admiral for the value of the Pegasus Claims transferred to Admiral plus interest from the date of its payment made under its settlement agreement with the Trustee. Royal is also entitled to attorney's fees and costs.

28. Therefore, Royal shall submit a proposed form of judgment to the Court within 14 days from the date of entry of these findings and conclusions. Royal shall also file its motion for attorneys fees and costs, pursuant to Fed. Rule of Bankr. P. 7054.

**###End of Findings and Conclusions###**
